MIDWEST OPERATING ENGINEERS
FRINGE BENEFIT FUNDS, et al.,

       Plaintiffs,

       v.

SULZBERGER EXCAVATING CO., et al.,

       Defendants.

No. 16 CV 4209

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Midwest Operating Engineers Fringe Benefit Funds and the Construction Industry Research and Service Trust Fund sue defendants Sulzberger Excavating, Inc., and SulzCo, LLC, under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1132, 1145, for delinquent contributions.[1] The International Union of Operating Engineers, Local 150, AFL-CIO sues defendants for union dues under the Labor Management Relations Act, 29 U.S.C. § 185. Plaintiffs and defendants cross-move for summary judgment solely on the issue of whether SulzCo is liable for SEI's obligations to the union and the funds. For the following reasons, plaintiffs' motion for summary judgment is denied and defendants' motions for summary judgment are granted.

---

[1] The amended complaint and case caption refer to Sulzberger Excavating Company, but the parties' briefs reference Sulzberger Excavating, Inc. or "SEI." Plaintiffs are no longer pursuing an action regarding a 2014 audit finding of SEI. [50] at 13.

## I.  Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Village of Greendale*, 475 Fed. App'x 92, 95 (7th Cir. 2012).

## II.  Background[2]

Sulzberger Excavating, Inc. was an excavating company that conducted business in the area around Muscatine, Iowa. [46] ¶ 1. SEI's president, Jerry Sulzberger, founded the company in 1960. *Id.* ¶ 4; [52] ¶ 3. Jerry was the majority

---

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from plaintiffs' responses to SEI's and SulzCo's LR 56.1 statements of fact, [46] and [47] respectively, and from SEI's response [52], and SulzCo's response [57], to plaintiffs' LR 56.1 statement of fact, where the asserted fact and accompanying response are set forth in the same document. SulzCo replied to plaintiffs' responses to SulzCo's LR 56.1 statement of fact, [56] at 1–5, but such replies are not permitted and are therefore disregarded. *See* LR 56.1. Any facts that were not properly controverted by reference to admissible evidence are deemed admitted. *Id.*

shareholder of SEI, owning 55%, with the remaining shares divided among his five sons. [46] ¶ 7; [52] ¶ 8. Throughout the years, Jerry employed various family members at SEI, including his son Barry Sulzberger, who was SEI's Vice President. [52] ¶¶ 8, 10. Jerry and Barry are members of the International Union of Operating Engineers, Local 150, AFL-CIO (Local 150), and SEI was a signatory to contracts with the union. [46] ¶ 8; [52] ¶¶ 6–7. Jerry also employed his grandson (Barry's son), Zack Sulzberger, as an estimator and Jerry's grand-nephew, Tyler Sulzberger, in accounting. [46] ¶¶ 13–14; [52] ¶¶ 10–11. The parties dispute the extent of Tyler's role, [46] ¶ 14; [52] ¶ 10, although there is no dispute that his CFO title was self-appointed. [45-2] at 8:22–9:4.

By 2014, Jerry had made it clear that he was retiring. [46] ¶¶ 12, 22; [52] ¶ 14; [61] ¶ 17. The following year, SEI stopped bidding on jobs and began slowly selling its equipment (there is some dispute as to whether SEI began selling large pieces of equipment even earlier, [52] ¶ 14), beginning a drawn-out liquidation process to minimize the tax consequences of winding up the business. [46] ¶¶ 12, 42; [52] ¶ 14. In May 2016, Jerry informed Local 150 that SEI was shutting down. [52] ¶ 9. By September 2016, SEI had sold most of its machines and had entered into a contract to sell the office and yard. *Id.* ¶ 14. Jerry was the only employee left, and he expected SEI to be completely liquidated by the end of 2017. *Id.*

When Jerry announced his retirement, Zack and Tyler began discussing carrying on in the excavating industry with their own, new company, instead of purchasing SEI. [46] ¶ 19. Zack and Tyler intended to start a non-union company.

[52] ¶ 15. The parties dispute whether the men were concerned about their employment if SEI closed. [61] ¶ 16; [62] ¶¶ 9–10. The parties agree that Tyler had observed some "bad blood" and "family drama" at SEI, that he viewed starting a new company as a "clean slate," free from SEI's tarnished reputation, and that Zack thought the business was a "mess." [62] ¶ 11. Plaintiffs dispute that these were the sole (or main) reasons for starting a new company. [61] ¶¶ 13–14; [62] ¶¶ 10–12. The parties also dispute whether Barry was interested in buying SEI and whether Zack and Tyler thought that Jerry would refuse to let anyone else run SEI. [52] ¶ 15; [61] ¶¶ 13–14; [62] ¶ 13. According to Jerry, Zack and Tyler did not want to buy SEI because they did not want to assume SEI's union contract, which made the company "basically like a dinosaur" and made it difficult to compete with local, largely non-union competitors. [52] ¶ 15; [62] ¶ 14; [45-2] at 87:22–88:1. Also, Tyler's father, Tim Sulzberger (Jerry's nephew), would not assist with financing and start-up unless the new company was non-union. [45-3] at 5:8–13.

In July 2014, Zack and Tyler formed SulzCo, LLC. [46] ¶ 20; [52] ¶¶ 5, 17; [62] ¶ 8. Zack is SulzCo's president, estimator, and project manager, and Tyler is Vice President and CFO. [52] ¶ 5. At the time they registered SulzCo, Zack and Tyler were still on full-time payroll at SEI. *Id*. ¶ 13. Zack was employed by SEI until early May 2015. [46] ¶ 36; [52] ¶¶ 10, 28. Tyler continued at SEI until late June 2015. [52] ¶¶ 10, 28. From June 2015 to June 2016, he assisted SEI with payroll and accounting matters as a consultant, billing SEI around $16,000 for his services and working on SEI computers (though he occasionally logged in to SEI's

computers remotely). [46] ¶ 37; [52] ¶¶ 10, 35; [62] ¶ 20. According to Jerry, Tyler was helping SEI until Jerry could find a replacement because he was "caught pretty flat footed." [62] ¶ 20. At some point in 2015, Zack and Tyler told Jerry that SulzCo had been formed and Jerry reportedly was "fine with it." [52] ¶ 27.

In early 2015, Zack and Tyler drafted a business plan, which was based off of SEI's work and research tools and which listed many of the same competitors. *Id*. ¶¶ 23–24. The business plan included arrangements to buy construction equipment from SEI because SEI was going out of business. *Id*. ¶ 25. Zack and Tyler also considered storing SulzCo's equipment at Barry's (Zack's father's) yard. *Id*. The business plan was drafted on either Tyler's personal computer or computers purchased by Zack and Tyler for SulzCo. [61] ¶ 19. In February 2015, Tyler, Zack, and Tyler's father, Tim Sulzberger (Jerry's nephew), presented the business plan to a bank. *Id*. ¶ 18. To obtain loans for starting up SulzCo and purchasing equipment, Tyler and Zack put up their personal assets as collateral. [52] ¶¶ 18, 37; [61] ¶ 20. Tim also took out a personal loan to purchase SulzCo's first pieces of equipment, and he personally guaranteed loans for purchasing equipment and obtaining an operating line of credit for SulzCo. [46] ¶¶ 29–30; [52] ¶ 18; [61] ¶¶ 21–22. Eventually, in 2016, SulzCo adopted an operating agreement giving Tim one-third ownership in SulzCo in exchange for financing; Zack and Tyler each own one-third as well. [46] ¶ 32; [62] ¶ 1. Tyler, Zack, and Tim do not own any interest in SEI. [62] ¶ 5. Jerry and Barry do not own any interest in SulzCo. *Id*. SEI has never applied for, guaranteed, or co-signed any application for a loan, or line of credit, for SulzCo.

[46] ¶ 49. In late 2014 or early 2015, Jerry offered to assist Zack and Tyler with securing bonding for SulzCo projects, but nothing ever came of it, and the parties dispute whether Jerry's offer was serious. [52] ¶ 22.

By the spring of 2015, SEI had stopped bidding for work and focused on finishing lingering projects. *Id*. ¶ 14. Unbeknownst to Jerry, SulzCo began bidding on work in April 2015. *Id*. ¶¶ 27–28; [39-1] at 45:14–22. SulzCo performed work in SEI's and Local 150's geographic jurisdiction, near Muscatine, Iowa (where both SEI and SulzCo are based). [52] ¶¶ 3–5. Zack worked as an estimator, and Tyler helped with numbers, bid bonds when necessary, insurance, and packing bids. *Id*. ¶ 28. Barry also helped Zack with estimates. *Id*. SulzCo bid on projects similar to those SEI performed, for similar or the same customers. *Id*. ¶¶ 28, 33. Plaintiffs and defendants dispute whether SulzCo performs the exact same work as SEI. *Id*. ¶ 5. Defendants contend that they only have three pieces of heavy equipment (fewer than SEI) and have started out only doing small repair jobs, though they plan to expand to do work similar to SEI. *Id*. SEI has never assigned an excavating job to SulzCo. [46] ¶ 45. To generate business for SulzCo, Zack and Tyler advertised their company by making calls to engineers, businesses, and cities and by taking out a phonebook ad. [52] ¶ 34.

In May 2015, Zack and Tyler purchased insurance for the company and SulzCo hired some former SEI employees, including Chad Estabrook (a Local 150 member), and two others. *Id*. ¶¶ 20–21, 38; [46] ¶¶ 8–9. None of these new employees were directly hired from SEI. For example, Estabrook left SEI in

6

December 2014 and did not start at SulzCo until May 2015. [61] ¶¶ 37–38. In October 2015, SulzCo hired Zack's brother, Jeremy, who had also previously worked for SEI. [52] ¶ 40. Zack and Tyler were interested in hiring at least three other SEI employees, but because they were Local 150 union members, Zack and Tyler did not think they would be interested in working for non-union SulzCo. *Id.* ¶ 39. Tyler drafted at-will, non-union employment agreements for SulzCo's employees, and he established SulzCo's pay scales based on non-union pay rates in the area construction industry. *Id.* ¶¶ 41–42. The Local 150 operator scale at SEI was $29.40 per hour, but SulzCo offered operator rates from $18.00 to $22.00 per hour based on years of experience. *Id.* ¶ 42. SulzCo, operating non-union, did not pay the union pension or retiree medical savings plans benefits for its employees, including Estabrook (a Local 150 member). *Id.* ¶ 44. In September 2015, SulzCo paid Estabrook a $4,069.79 bonus—another employee was given a bonus as well. *Id.*; [62] ¶ 22. Plaintiffs assert that this bonus effectively compensated Estabrook for unpaid union pension and retiree medical savings plan contributions, minus SulzCo's health insurance contributions for Estabrook. [52] ¶ 44. Defendants assert that this was an incentive bonus for project completion. *Id.*

SulzCo's first project also began in May 2015 and was a small repair job for a former customer of SEI. *Id.* ¶ 45; [61] ¶ 24. Tyler, although still a full-time SEI employee, went to the SulzCo jobsite to photograph the start-up. [52] ¶ 46. (At that time, Zack was no longer employed by SEI. *Id.* ¶ 10.) That same month, a local newspaper published an online news story, interviewing Zack and Tyler about

SulzCo. *Id*. ¶ 36. In the article, Zack and Tyler stated that they were "carry[ing] on" the business and the family name. *Id*.; [45-6] at 10–11. SulzCo did not request any clarifications to the article. [52] ¶ 36. The article also stated that Zack and Tyler decided to move forward with a new company and a new name because they had no ownership stake in SEI, and Jerry's children were themselves approaching retirement age and uninterested in continuing SEI. [45-6] at 11.

That same month, SulzCo also began purchasing equipment from SEI, using money from a loan obtained by Tim. [52] ¶ 49. From May to October 2015, SulzCo owned just three pieces of heavy equipment, all purchased from SEI. [46] ¶ 34. Tyler prepared for SEI, and executed on SulzCo's behalf, a bill of sale for SulzCo's purchase of a backhoe and excavator from SEI. [52] ¶ 49. SulzCo purchased the backhoe for $20,000 and the excavator for $25,000, although SEI had insured this equipment at actual cash values of $22,000 and $45,000, respectively. *Id*. ¶ 50. In October 2015, SulzCo purchased a front end loader from SEI for $27,780. [45-7] at 36. SulzCo had previously rented the machine from SEI for $14,220. [52] ¶ 52. SEI had insured it for $50,000. *Id*.

Over time, SulzCo rented and purchased more equipment from SEI and from various auctions. [46] ¶ 38; [52] ¶ 70; [61] ¶ 25. Jerry used auction sales prices to estimate fair market value of the equipment SEI sold to SulzCo. [52] ¶ 53; [62] 24. SEI also sold equipment to other companies and at auctions, but Jerry preferred to sell SEI's equipment to other companies because he had been "burned" at auctions

in the past. [61] ¶ 28; [62] ¶ 25. Several pieces of equipment purchased from SEI retained the SEI logo. [52] ¶ 67.

SulzCo also occasionally leased employees and equipment from SEI. *Id.* ¶ 56. Sometimes Zack would make arrangements with Jerry to lease SEI employees for SulzCo jobs, and sometimes Jerry would call SulzCo to see if they had work for Barry and for Jerry's two other sons (also Local 150 members). *Id.*; [62] ¶ 28. Between August 2015 and June 2016, SulzCo leased multiple union-member employees—including Barry—from SEI to work on different projects. [52] ¶¶ 57–59. As long as SEI paid the required contributions for its Local 150 employees, it was not a violation of the Master Agreements for SEI to subcontract its union-member employees to another excavating company. [62] ¶ 29. The parties dispute whether Barry ever acted as a foreman or supervisor on these jobs. [52] ¶ 57. SulzCo also leased some of the equipment it purchased from SEI back to SEI. *Id.* ¶ 62. SEI has leased equipment to only two companies other than SulzCo, and one of those companies was a union-signatory company owned by another of Jerry's nephews. *Id.* ¶ 63. SulzCo has also leased heavy equipment from two equipment rental shops, a company owned by Zack's brother (Jeremy), and a general contracting company owned by Jerry's nephew, for which SulzCo now often works as a subcontractor. [62] ¶ 30.

Starting in 2015, Barry allowed SulzCo to store heavy equipment and supplies at his farm. [52] ¶¶ 68, 70. In November 2015, Barry also began providing SulzCo with, and billing for, consulting services. *Id.* ¶ 71. Barry retired from SEI in

December 2015. *Id*. ¶ 8. Afterward, he continued to provide consulting and other assistance to SulzCo, only billing for some of his work. *Id*. ¶¶ 71–72; [62] ¶ 19.

SulzCo performs the same scope of work as SEI, also in Local 150's geographic jurisdiction, within approximately 60 miles of Muscatine, Iowa. [57] ¶ 5. Although both are located in Muscatine, Iowa, SEI and SulzCo have different office addresses. *Id*. ¶¶ 3–4; [61] ¶¶ 2–3. SEI and SulzCo have never shared or jointly operated a bank account. [61] ¶ 32.[3] SEI and SulzCo have submitted competing bids only twice, once in 2015 (for a job that neither received), and once in 2016 (at a time when Jerry was the sole remaining SEI employee). *Id*. ¶ 31. Out of the nine total employees that SulzCo has hired, three were former employees of SEI. [62] ¶ 21. SulzCo did not ultimately purchase all the heavy equipment it originally listed in its business plan, nor did it bid on all the jobs in the plan. *Id*. ¶ 27.

In 2015, Local 150 began inquiring about the relationship between SEI and SulzCo, eventually sending SEI a questionnaire about the companies' relationship. [52] ¶¶ 73–75. Jerry, responding on behalf of SEI, stated that the formation of SulzCo "forced" it to liquidate, even though Jerry had been discussing liquidation since 2014. *Id*. ¶ 75; *see* [45-13] at 12. He failed to answer many of the questions, identified himself as the primary bookkeeper of SEI, did not acknowledge that SEI had rented or used equipment after selling it to SulzCo or that SEI had leased employees to SulzCo, and did not answer whether Tyler had been an officer of SEI.

---

[3] Plaintiffs failed to respond this fact, so it is admitted. LR 56.1.

[52] ¶ 75. Jerry also indicated in his answers that neither SEI, nor its officers or shareholders, had contributed assets or funds to SulzCo. *Id.* ¶ 75.

## III. Analysis

The only issue raised by the parties' cross-motions for summary judgment is whether SEI's obligations under the applicable collective bargaining and trust-fund agreements can be imposed on SulzCo. As a threshold matter, plaintiffs and SEI apply federal common law, while SulzCo's motion applies Iowa law (as SEI and SulzCo are both Iowa corporations). SulzCo, however, applies federal common law in its reply brief and in response to plaintiffs' motion for summary judgment. Federal common law on successor liability applies to this case because the state law of successor liability, which cuts off the obligation to pay a predecessor's promised contributions, significantly conflicts with the federal interest in minimizing contribution losses and burdening other plan participants. *Moriarty v. Svec*, 164 F.3d 323, 328–29 (7th Cir. 1998) (citing *Atherton v. FDIC*, 519 U.S. 213, 218 (1997)).

In the labor-law-successorship or joint-liability context, courts must "balance the well-articulated federal interest in ensuring that employers maintain properly funded pension plans and the social interest in facilitating the market in corporate and other productive assets." *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325 (7th Cir. 1990). The parties generally agree that, under federal common law, labor liability may be imposed on another company, where: (1) two nominally separate businesses operate as a single employer; (2) a company is the alleged "alter ego" of a collective-bargaining-agreement signatory seeking to avoid its obligations; or (3) a successor company

11

expressly or implicitly assumed the collective bargaining obligations of its predecessor.[4] The parties seek summary judgment in their respective favor on these theories of liability.

## A.    Single Employer

Under the single-employer doctrine, when two entities are sufficiently integrated, they will be treated as a single entity for labor-liability purposes. *Svec*, 164 F.3d at 332 (citing *Radio and Television Broadcast Technicians Local Union 1264 v. Broadcast Service*, 380 U.S. 255, 256 (1965)). To determine whether two nominally separate business entities operate as a single employer, a fact-finder examines four factors: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. *Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen, Dist. Council of Wisconsin & Its Local 5*, 724 F.3d 939, 946 (7th Cir. 2013) (citing *S. Prairie Constr. Co. v. Local No. 627, Int'l Union of Operating Eng'rs*, 425 U.S. 800, 803 (1976)). Although centralized control of labor relations is a significant factor, *Gen. Drivers, Warehousemen & Helpers, Local Union No. 89 v. Pub. Serv. Co. of Indiana*, 705 F.2d 238, 242 (7th Cir. 1983), no single factor is determinative, and a decisionmaker must weigh the totality of the circumstances. *Lippert Tile Co.*, 724 F.3d at 946–47. "Ultimately, single employer status . . . is characterized by the absence of an arm's length relationship found among unintegrated companies." *Id.* at 947. Plaintiffs have not

---

[4] The parties also agree that liability can be imposed in a fourth instance—under the "successorship" doctrine. [50] at 6; [55] at 4. As discussed below, however, plaintiffs failed to develop any argument based on this theory and have therefore waived their ability to do so.

shown a genuine dispute of material fact that demonstrates that they could establish single-employer liability, and this failure of proof entitles defendants to judgment as a matter of law. Three of the four factors are missing: common ownership, common management, and centralized control of labor relations.

Plaintiffs acknowledge that SEI and SulzCo do not have common ownership. Jerry and his sons own SEI. Tyler, Zack, and Tim own SulzCo. Plaintiffs argue that this factor can be met, however, by showing SEI's contributions to SulzCo's formation: keeping Zack and Tyler on payroll, selling equipment for less than its insured value, subcontracting employees to SulzCo, and by Barry allowing SulzCo to store its equipment on his land. But plaintiffs cite no authority substituting mere business assistance, or favorable terms, for common ownership. And the lack of common ownership "stands strongly against the imposition of single employer liability." *Trustees of the Pension, Welfare & Vacation Fringe Ben. Funds of IBEW Local 701 v. Favia Elec. Co.*, 995 F.2d 785, 788 (7th Cir. 1993).

The common-management factor looks at an entity's "actual or active control, as distinguished from potential control, over the other's day-to-day operations." *Lippert Tile Co.*, 724 F.3d at 947 (quoting *Cimato Bros.*, 352 NLRB 797, 799 (2008)). Having a formal job title does not necessarily indicate actual management responsibility. *Cremation Soc'y of Illinois, Inc. v. Int'l Bhd. of Teamsters Local 727*, No. 16-2322, 2017 WL 3699804, at *4 (7th Cir. Aug. 28, 2017). Plaintiffs argue that Jerry, Barry, and Tyler exercised common management over both SEI and SulzCo. Plaintiffs provide no evidentiary support, however, for Jerry's alleged management

of SulzCo—they merely argue that he gave his blessing for SulzCo's formation and assisted with its transition. But it is undisputed that Jerry did not even know when SulzCo began bidding on projects. Plaintiffs also argue that Barry worked as a project manager for both SEI and SulzCo before he retired, and that he continued to assist SulzCo after his retirement. But managing work sites at two companies is not the same as exercising managerial control over a company's day-to-day operations. *See Trustees of IBEW Local 701*, 995 F.2d at 788 (concluding that companies had nominally separate management where husband was sole proprietor of Company A and wife was active president of Company B; the fact that husband managed the work sites for both businesses "was not sufficient to destroy the separateness of management").

Plaintiffs also contend that Tyler acted as SEI's CFO, and he is undisputedly SulzCo's CFO. Tyler's self-appointed CFO title at SEI is irrelevant—only actual managerial authority matters. Although the extent of his accounting and financial management is disputed by the parties, it is not disputed that he worked on accounting, payroll, and billing while at SEI, and that he continued to help SEI on these matters after he transitioned to SulzCo, billing SEI for his consulting services and working on SEI's computers, sometimes accessing them remotely. Through Tyler, there is some overlap in the companies' financial and accounting management. But without more to suggest that SEI had managerial control over SulzCo's day-to-day operations, such as its bidding or administration, or that SulzCo had control over SEI's liquidation, this is not enough to destroy the

separateness of the companies' management. *See Cremation Soc'y of Illinois*, 2017 WL 3699804, at *4 (determining that the common-management factor weighed in favor of a single-employer finding where employees in both companies reported to the same managers and executives, were part of the same organization chart, and where the companies shared an executive board).

Nor do SulzCo and SEI share centralized control of labor relations. This factor considers "who is responsible for hiring, firing and evaluating employees." *Id.* Plaintiffs argue that SEI and SulzCo maintained centralized control of labor relations between Jerry, Barry, and Zack. It is undisputed, as plaintiffs maintain, that Jerry and Zack coordinated SulzCo's subcontracting of SEI's employees on a number of occasions (over forty times during the course of eight SulzCo projects). Plaintiffs also argue that Barry supervised employees at SulzCo while he was managing SEI-subcontracted jobs, and later helped out around SulzCo after his retirement. Even so, these facts do not show that SEI and SulzCo shared responsibilities for hiring, firing, and evaluating each other's employees. Plaintiffs have not identified evidence in the record to suggest that Jerry or Barry could hire or fire SulzCo employees, or that they could decide when SulzCo would subcontract SEI employees (other than calling to see if SulzCo had work for SEI employees). *See id.* (holding centralized control of labor relations existed where one person hired, fired, and evaluated employees of both companies, even though only one company paid her salary). Moreover, there is nothing in the record to show that Zack had any control over SEI's employees, other than choosing to hire them as subcontractors.

The remaining factor—interrelation of operations—cuts both ways. When analyzing the interrelation of operations, "day-to-day operational matters" are most relevant. *Id*. Interrelated operations include companies that operate out of the same building, use the same employees, have the same organizational chart or management, operate in the same geographic market and industry with the same or similar customers, share computers and phone numbers, use the same bank accounts, or use the same payroll and billing entity. *See id.*; *Lippert Tile Co.*, 724 F.3d at 947; *R.R. Maint. Laborers' Local 1274 Pension, Welfare & Educ. Funds v. Kelly R.R. Contractors*, 591 F. Supp. 889, 896 (N.D. Ill. 1984). Indicators of non-interrelated operations include maintenance of separate records, licenses, bank accounts, equipment, and phone numbers. *See Trustees of IBEW Local 701*, 995 F.2d at 788; *RKN Concrete Constr., Inc. v. Laborers' Pension Fund*, No. 13 C 9153, 2015 WL 1888513, at *7 (N.D. Ill. Apr. 24, 2015).

There are some indications that SEI and SulzCo are interrelated. Both companies operate in the same geographical area in Iowa, in the same industry (although SulzCo started out performing only smaller repair jobs), with the same or similar customers. Tyler and Zack based their business plan off of SEI's work. There is also some overlap in the workforce. SulzCo employed some former SEI employees and subcontracted SEI employees for several projects. SulzCo purchased and rented equipment from SEI. Though SEI also sold and rented equipment to other companies and sold equipment at auctions.

But the companies' day-to-day operations are not entirely intertwined. SEI and SulzCo operate from different offices and have different bank accounts. SulzCo obtained funding through Tyler, Zack, and Tim's personally guaranteed loans. SEI never assisted SulzCo with loans or lines of credit, and SEI never assigned excavating jobs to SulzCo. Although SulzCo stores equipment on Barry's personal property, it does not utilize SEI property. Tyler performed accounting work at both companies, but once he left SEI he was paid by them as a consultant, not an employee, and performed SEI work only on SEI computers (or by remotely accessing SEI computers). Although there is some evidence indicating that the companies' operations were interrelated, a fact-finder could not find that SEI and SulzCo were single employers because the other three factors are missing.

## B.    Alter Ego

The alter-ego doctrine applies where the successor is merely a disguised continuance of a former company, *Int'l Union of Operating Engineers, Local 150 v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir. 1987), or where the entity arguably seeking to avoid its obligations exists alongside its alleged alter ego. *Cent. States, Se. & Sw. Areas Pension Fund v. Sloan*, 902 F.2d 593, 597 (7th Cir. 1990) (noting that the alter-ego doctrine is not limited to fact patterns where the original employer has disappeared entirely). The alter-ego analysis is similar to the single-employer analysis, but an alter ego can exist even where there is no evidence of actual common ownership. *Id*. A plaintiff must show more than the single-employer factors to establish that one organization is the alter ego of another. *Id*. The key to

the alter-ego analysis is a finding of "unlawful motive or intent." *Trustees of IBEW Local 701*, 995 F.2d at 789.

Tyler and Zack intended to start a new, non-union company, but it is the intent of the *signatory* to the collective bargaining agreement—here SEI (i.e., Jerry or Barry)—to avoid its obligations under the agreement that matters.[5] *See RKN Concrete Constr.*, 2015 WL 1888513, at *8–9 (looking to the lack of unlawful motive of a collective bargaining agreement signatory); *Chicago Dist. Council of Carpenters Pension Fund v. Vacala Masonry, Inc.*, 967 F.Supp. 309, 317 (N.D. Ill. 1997) (same). Plaintiffs do not dispute that it is the signatory's intent that is relevant, and they respond that Jerry's unlawful intent can be inferred from the record because he approved of SulzCo's formation and he agreed that SEI's union contracts made it an uncompetitive "dinosaur" in the local, largely nonunion industry. While the undisputed record shows, at most, that Jerry was "fine" with SulzCo's formation once he found out about it, it does not show that he instigated SulzCo's formation to avoid SEI's collective bargaining agreement obligations (although his retirement may have been the catalyst). *See* [52] ¶ 27; [45-2] at 47:10–12. His characterization of SEI as a dinosaur was in response to being questioned about Zack and Tyler's lack of interest in taking over SEI. [45-2] at 87:22–88:3 ("Q. They were not interested in taking over SEI? A. No. SEI, with the union contract, is basically like the dinosaur. It is pretty hard to compete. Q. Okay. So they didn't want that union

---

[5] Defendants also argue that the intent to create a new, non-union company was not unlawful—and instead motivated by other concerns, including avoiding family drama, starting from a clean slate, and ensuring Tim's assistance.

contract? A. No."). It does not show Jerry's intent to disguise SEI as SulzCo to avoid SEI's obligations. Plaintiffs have not identified anything in the record showing SEI's or Jerry's intent to avoid their obligations under the collective bargaining agreement. Without such a showing, plaintiffs cannot establish that the signatory—SEI—sought to avoid its collective bargaining agreement obligations by creating SulzCo as an alter ego.

## C. Assumption of Obligations

A successor company may be bound by its predecessor's collective bargaining agreement obligations when: (1) there is "'substantial continuity of identity in the business enterprise' before and after a change of ownership"—which necessarily includes "a substantial continuity in the identity of the work force across the change in ownership"—and (2) the successor has expressly or impliedly assumed the contractual obligations. *Howard Johnson Co. v. Detroit Local Joint Exec. Bd., Hotel & Rest. Emp. & Bartenders Int'l Union*, 417 U.S. 249, 263 (1974) (quoting *John Wiley & Sons v. Livingston*, 376 U.S. 543, 551 (1964). Requiring both "substantial continuity in the identity of the work force" and an express or implied assumption balances the protection of employee interests with a new employer's right to operate with an independent labor force. *Howard Johnson Co.*, 417 U.S. at 255, 264. An employer may impliedly assent to and assume an obligation "by a consistent pattern of conduct conforming to the terms of the agreement." *Audit Servs., Inc. v. Rolfson*, 641 F.2d 757, 764 (9th Cir. 1981) (holding that a successor assumed the obligation to contribute to trust funds where it behaved as if it had signed the collective bargaining agreement).

Defendants argue that there was no substantial continuity in the work force because, other than Zack and Tyler, SulzCo only hired three former SEI employees—several SEI employees were never hired—and it never assumed SEI's Local 150 obligations, either explicitly or implicitly. Plaintiffs argue that there was continuity in the work force because SulzCo repeatedly subcontracted SEI's employees, that SulzCo explicitly assumed SEI's obligations by subcontracting SEI employees, and that SulzCo implicitly assumed SEI's obligations by paying Estabrook a bonus equaling the pension benefits that he would have received under the Local 150 contract.

The assumption doctrine does not apply in this case because there was no substantial continuity of identity in the business enterprise before and after a change of ownership. There was no change in ownership at all—SEI and SulzCo existed at the same time. SulzCo did not buy SEI, only some of its equipment. SulzCo may have subcontracted some SEI employees, hired a few after they were let go from SEI, and rented some of SEI's equipment, but there was no asset purchase, no merger, no change in ownership, and no successor-predecessor relationship as contemplated in *Howard*. This situation is a poor fit for the assumption doctrine. Substantial continuity is shown when a successor hires a majority of a predecessor's employees or when employees are retained in the transition from one corporate organization to another, *Howard Johnson Co.*, 417 U.S. at 263, not when employees are still retained by one company and subcontracted to another company paying for their services. *See Steinbach v.*

*Hubbard*, 51 F.3d 843, 847 (9th Cir. 1995) (holding that a company that leased assets of another company for three to four months was not a successor for imposition of liability). Though the single-employer and alter-ego doctrines can create joint liability for concurrently existing companies, plaintiffs have cited no authority for extending the assumption doctrine beyond a predecessor-successor relationship.

Even assuming a predecessor-successor relationship and substantial continuity between SEI and SulzCo, the record does not establish SulzCo's explicit or implicit assumption of SEI's Local 150 obligations. There was no explicit assumption because SulzCo never agreed verbally or in writing to assume SEI's obligations. Plaintiffs' argument that SulzCo explicitly agreed to assume Local 150 contract obligations by repeatedly subcontracting SEI employees is based on implicit assumption, not explicit assumption. And it is undisputed that the union contract permitted subcontracting arrangements. Without more, plaintiffs cannot show explicit adoption of SEI's obligations.

Plaintiffs have also failed to show a genuine dispute of fact over implicit assumption. Even if SulzCo's bonus to Estabrook was intended to equal the benefits he would have received under the Local 150 contract (a fact disputed by the parties), that fact alone is insufficient to show implicit assumption. *See Moriarty v. Consol. Funeral Servs., Inc.*, 65 F.Supp.2d 853, 864 (N.D. Ill. 1999) (holding that paying the same salary as the previous owner—who was a signatory to the union

contract—was insufficient evidence to raise a genuine issue of material fact). The assumption doctrine does not apply to SulzCo.

### D. Successorship Doctrine

Plaintiffs and SEI also recognize that another theory of liability exists—the "successorship" or "successor liability" doctrine. But although plaintiffs reference this theory, they developed no argument based on it and do not respond to SEI's arguments that this doctrine does not apply. [49] at 5; [50] at 6. Plaintiffs have waived any argument based on this theory of liability. *See Hassebrock v. Bernhoft*, 815 F.3d 334, 342 (7th Cir. 2016) (arguments not made at summary judgment are waived).

## IV. Conclusion

Plaintiffs' motion for summary judgment, [43], is denied. Defendants' motions for summary judgment, [34], [37], are granted.

ENTER:

Manish S. Shah
United States District Judge

Date: September 14, 2017